# In the United States Court of Federal Claims

No. 09-092
Filed: January __, 2012
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| THE NASCENT GROUP, J.V., by | * | Defense Appropriation Act, Pub. L. No. 107- |
| NATIVE AMERICAN SERVICES | * | 107; |
| CORPORATION, INC., | * | Implied Covenant of Good Faith and Fair |
| | * | Dealing; |
| Plaintiff, | * | Offer; |
| | * | Option; |
| v. | * | Patent Ambiguity of Contractual Terms. |
| | * | |
| UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Terance Patrick Perry**, Missoula, Montana, Counsel for Plaintiffs.

**Cameron Cohick**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge*.

      The parties agree that the Army Corps of Engineers ("the Army Corps") contracted with the NASCENT Group Joint Venture ("NASCENT")[1] to construct a Border Patrol Station at Blaine, Washington ("the Blaine Project"). NASCENT, however, claims that it also contracted to construct a second Border Patrol Station at Lynden, Washington ("the Lynden Project") and priced the Blaine Project with this understanding. The parties also do not dispute that, when NASCENT was awarded a contract to construct the Blaine Project, the Army Corps had not obtained funding for the Lynden Project. At issue is whether NASCENT was awarded a contract to construct the Blaine Project and the Lynden Project, or only the Blaine Project, with an Army Corps option to later award the Lynden Project.

      Following a three-day trial, extensive post-trial briefing, and considering comprehensive arguments of NASCENT's counsel as to all potential theories under which NASCO could be

---

[1] NASCENT is a joint venture between Native American Services Corporation ("NASCO"), a disadvantaged minority business, and Shaw-Beneco, Inc. ("Shaw-Beneco"), a business that volunteered with the Small Business Administration to be a mentor under the "mentor-protégé" program  Jt. Stip. No. 2.

entitled to relief, for the reasons discussed herein, as a matter of fact and law, the court has determined that NASCENT did not and cannot establish any express breach of contract and/or a breach of the implied covenant of good faith and fair dealing.

To facilitate review of this Memorandum Opinion and Final Order, the court has provided the following outline:

## I. RELEVANT FACTS.

**A. Congress Appropriated Funds For The Army Corps Of Engineers To Construct Border Patrol Stations In Blaine, Washington And Lynden, Washington.**

**B. On November 13, 2003, The Army Corps Of Engineers Requested Proposals To Construct Border Patrol Stations In Blaine, Washington And Lynden, Washington.**

**C. On December 16, 2003, Plaintiff Submitted A Proposal.**

**D. On January 14, 2004, The Army Corps Issued Amendments To The November 13, 2003 Proposal.**

**E. On January 28, 2004, Plaintiff Submitted A Revised Proposal.**

**F. During February-March 2004, Plaintiff And The Army Corps Of Engineers Engaged In Pre-Contractual "Value Engineering" Discussions.**

**G. On March 11, 2004, The Army Corps Of Engineers' Project Manager And Technical Representative Sent An E-mail To Plaintiff.**

**H. On March 16, 2004, Plaintiff Sent A Facsimile To The Army Corps Of Engineers, Submitting A Price Of $6,466,717 For The Blaine Project.**

**I. On April 21, 2004, The Army Corps Of Engineers' CO Signed DD Form 1155, With Attachments, A Copy Of Which Was Found In Plaintiff's Files.**

**J. On April 22, 2004, The Army Corps Of Engineers Sent A "Notice Of Award Information" To Plaintiff By Facsimile.**

**K. In May 2004, The Army Corps Of Engineers And Plaintiff Agreed To Bilateral Modification No. 1.**

**L. On May 10, 2004, A Notice To Proceed Was Issued Regarding The Blaine Project.**

**M. The Army Corps Of Engineers' Attempts To Secure Funding For The Lynden Project.**

II.     PROCEDURAL HISTORY.

III.    JURISDICTION.

IV.     STANDING.

V.      DISCUSSION.

      A.     Whether The Army Corps Of Engineers' March 11, 2004 E-Mail Was An Offer That Plaintiff Accepted By A March 16, 2004 Facsimile.

            1.     The Plaintiff's Argument.

            2.     The Government's Response.

            3.     The Court's Resolution.

                  a.     The Army Corps Of Engineers' March 11, 2004 E-Mail Was Not An Offer.

                  b.     Even If The Army Corps of Engineers' March 11, 2004 E-Mail Was An Offer, Plaintiff's March 16, 2004 Facsimile Was Not An Acceptance.

      B.     Whether The Parties Formed A Contract On April 21, 2004, In Response To Plaintiff's March 16, 2004 Facsimile Proposal Offering To Construct The Blaine Project, With An Option To Construct The Lynden Project.

            1.     The Plaintiff's Argument.

            2.     The Government's Response.

            3.     The Court's Resolution.

                  a.     Plaintiff's March 16, 2004 Facsimile Offered To Construct The Blaine Project, With The Lynden Project As An Option.

                  b.     The Army Corps Of Engineers' April 21, 2004 DD Form 1155, With Attachments, Accepted Plaintiff's March 16, 2004 Offer.

      C.     Assuming, *Arguendo*, That A Contract Was Not Formed On April 21, 2004, Whether The Army Corps Of Engineers' April 22, 2004 Facsimile Was A Contract To Construct The Blaine Project, With The Lynden Project As An Option.

       1.       **Assuming, *Arguendo*, That A Contract Was Formed By The Army Corps Of Engineers' April 22, 2004 Facsimile, Did The Terms Thereof Unambiguously Award Plaintiff The Blaine Project, With The Lynden Project As An Option?**

       2.       **Assuming, *Arguendo*, That The Army Corps of Engineers' April 22, 2004 Facsimile Was Ambiguous, Was Any Ambiguity "Patent," Thus Requiring The Ambiguity To Be Construed In Favor Of The Army Corps Of Engineers?**

   **D.**      **Whether The Army Corps Of Engineers Breached The Implied Covenant of Good Faith And Fair Dealing.**

       1.       **The Plaintiff's Argument.**

       2.       **The Government's Response.**

       3.       **The Court's Resolution.**

**VI.**    **CONCLUSION.**

\*   \*   \*

**I.**    **RELEVANT FACTS.**[2]

   **A.**      **Congress Appropriated Funds For The Army Corps Of Engineers To Construct Border Patrol Stations In Blaine, Washington And Lynden, Washington.**

In the National Defense Authorization Act For Fiscal Year 2002, Pub. L. No. 107-107, 115 Stat. 1012 (2001), Congress appropriated funds to construct Customs and Border Protection ("CBP") facilities at three locations at or near the Canadian border: Blaine, Washington; Lynden, Washington; and Oroville, Washington.  JX 5.

The Army Corps received $10.1 million to construct the Blaine Project that would include both a CBP headquarters building and a smaller border patrol station, but only a budget item of $4.5 million to construct the smaller CBP station at Lynden.[3]  JX 5; TR at 122, 134, 260-62 (Saepoff).

---

[2] The relevant facts were derived from: Joint Exhibits ("JX") 1-76; Plaintiff's Trial Exhibits (PX 1-130); the April 21, 2011 deposition of Joseph Giuliano (PX 131, 133); the Government's trial exhibits (DX 1-137); the parties' April 1, 2011 Joint Stipulations of Fact ("Jt. Stip."); and testimony at trial (referenced herein as "TR at __ (witness name)").  *See also* Court Exhibits A and B (identifying trial witnesses).

[3] The third Border Patrol Station at Oroville, Washington is not at issue in this case.

In addition, the Army Corps was not authorized to transfer or reprogram funds between projects, *i.e.,* from the Blaine Project to the Lynden Project, without approval from DHS.  TR at 136-137, 262-263 (Saepoff).  The Army Corps used some of the appropriated funds to purchase property, and after the Army Corps' purchase of real estate for the Lynden Project and budgeting for other Army Corps expenses, $3.3 million remained for design and construction of the Lynden Project.  JX 19 at COE 00522; TR at 263-64, 266-67, 272-73 (Saepoff) (explaining the use of funds).  After purchasing real estate and budgeting for internal Corps expenses, $5.6 million remained for the Blaine Project.  JX 19 at COE 00522.

On August 29, 2003, NASCENT was one of three contractors awarded a Multiple Award Task Order Contract ("MATOC") by the Seattle District Office of the Army Corps of Engineers. Jt. Stip. Nos. 2, 3; JX 9.

**B.    On November 13, 2003, The Army Corps Of Engineers Requested Proposals To Construct Border Patrol Stations In Blaine, Washington And Lynden, Washington.**

On November 13, 2003, the Contracting Officer ("CO") invited NASCENT and the two other MATOC contractors to submit proposals to construct the Blaine Project and/or the Lynden Project, pursuant to Request for Proposal ("RFP") No. W912DR-04-T-2101, "Design-Build: U.S. Customs and Border Protection Sector Headquarters Blaine and U.S. Customs and Border Protection Station Lynden."  JX 13 at COE 0056.  The RFP represented that $3.1 million was available for design and construction of the Lynden Project and that $5.6 million was available for design and construction of the Blaine Project.  JX 13 at COE 0063.  The cover letter specifically advised, however, that this "AWARD IS SUBJECT TO THE AVAILABILITY OF FUNDS."  JX 13 at COE 0057.  The RFP further stated: "Funds are not currently available for award of this Task Order in Seattle District.  No Task Order will be awarded until appropriated funds are made available[.]"  JX 13 at COE 0068.  Section 00110 of the RFP, "Proposal Submission and Evaluation" added: "The Government reserves the right to award a single Firm fixed-price Task Order for both projects or award multiple Firm fixed-price Task Orders[,] one for each project."  JX 13 at COE 0068.

Accordingly, the RFP required that contractors submit three proposals: 1) "Schedule A" for all required work for the Blaine Project; 2) "Schedule B" for all required work for the Lynden Project; and 3) "Schedule C" for both the Blaine Project and the Lynden Project.  Jt. Stip. No. 5; JX 13 at COE 0061-63.  Offerors were informed that the Blaine Project and the Lynden Project could be awarded to one contractor or different contractors.  TR at 120-21 (Saepoff).

On November 21, 2003, the Army Corps conducted a pre-proposal conference at which NASCENT's Project Manager and Technical Representative, Steve Saepoff, was present.  TR at 118-19 (Saepoff); TR at 448-49 (Fashimpaur).  During this conference, NASCENT's Project Manager, Kurt Fashimpaur, specifically asked if funding was authorized for both Projects.  PX 27 at COE 0575; TR at 122 (Saepoff).  The Army Corps indicated that funding was secured and that it was "pressed [by CBP] to award the Blaine and Lynden projects" and the sites had been acquired.  TR at 119-20 (Saepoff); TR at 449-50 (Fashimpaur).  Therefore, the Army Corps

anticipated that an amendment would be issued reflecting that both contracts would be awarded. PX 27 at COE 0576.

On November 26, 2003, the Army Corps issued an "Amendment of Solicitation," stating that the total amount of funds for the Lynden Project was $3.3 million, but indicated the Army Corps "may choose to exceed this amount." JX 19 at COE 0522.

### C. On December 16, 2003, Plaintiff Submitted A Proposal.

On December 16, 2003, NASCENT submitted a proposal in response to the November 13, 2003 RFP that included: Schedule A (the Blaine Project) - $5,204,274; Schedule B (the Lynden Project) - $3,858,419; Schedule C (the Blaine Project and the Lynden Project) - $8,597,570. Jt. Stip. No. 11; JX 24 at COE 1068-1070. Schedule C included a discount from the individual prices to construct the Lynden Project and the Blaine Project separately, because NASCENT assumed it would realize economies of scale by constructing both projects at the same time. Jt. Stip. No. 14.

### D. On January 14, 2004, The Army Corps Issued Amendments To The November 13, 2003 Proposal.

On January 14, 2004, the CO sent a letter to NASCENT enclosing Amendment 0005 to the RFP, including Leadership in Energy and Environmental Design ("LEED") requirements and other minor changes, and requesting that NASCENT submit a revised proposal. Jt. Stip. No. 18; TR 435 (Fashimpaur).

### E. On January 28, 2004, Plaintiff Submitted A Revised Proposal.

On January 28, 2004, NASCENT submitted a revised proposal, with a discount for constructing the Blaine Project and the Lynden Project simultaneously. Jt. Stips. Nos. 19, 22. NASCENT's revised bid was: Schedule A (the Blaine Project) - $6,427,054; Schedule B (the Lynden Project) - $4,795,009; Schedule C (the Blaine Project and the Lynden Project) - $10,998,907. Jt. Stip. No. 20; JX 29 at COE 1078-1080. The prices for these separate proposals included increased costs to comply with the LEED requirements required by Amendment 005. TR at 456-59 (Fashimpaur).

### F. During February-March 2004, Plaintiff And The Army Corps Of Engineers Engaged In Pre-Contractual "Value Engineering" Discussions.

During February and March of 2004, the Army Corps entered into "value engineering" discussions with all "competitive" contractors, although each had submitted proposals that exceeded available funds. TR at 284-85 (Saepoff). NASCENT participated with Army Corps staff in at least four teleconferences and two in-person meetings in Seattle. TR at 284-87 (Saepoff); TR at 473 (Fashimpaur); TR at 640-41 (Newby); TR 752-53 (Gonzalez).[4]

----

[4] Saepoff led the discussions on behalf of the Army Corps, functioning as the CO's technical representative. TR at 285 (Saepoff); TR at 642 (Newby); TR at 763 (Gonzalez).

The parties dispute what was said during the "value engineering" conversations that took place between February and March of 2004.  At trial, the Army Corps Project Manager and Technical Representative testified that he never offered to award Blaine and/or Lynden to NASCENT.  TR at 181-82, 287-88 (Saepoff); *see also* TR at 643 (Newby); TR at 800 (Gonzalez).  NASCENT's Project Manager, however, testified that the Army Corps represented that both the Blaine Project and the Lynden Project would be awarded to NASCENT.  TR at 484 (Fashimpaur); *see also* TR at 708 (Sheppard).  NASCENT's Project Manager claims that NASCENT's Co-Manager emphasized during the March 2004 negotiations that NASCENT would not perform work on the Blaine Project, unless it also was awarded the Lynden Project.  TR at 631 (Fashimpaur).

At trial, neither party asked NASCENT's Co-Manager directly whether he ever told the Army Corps that NASCENT refused to construct only the Blaine Project.  TR at 676-77 (direct examination of NASCENT's Co-Manager regarding March 2004 conversations); 706-10 (cross examination).  NASCENT's Co-Manager stated, however, that during the "value engineering" discussions, NASCENT was "trying to price so that we could get the price down so that [the Army Corps] could award both [projects].  Not once after [the January 28 bid] did we talk about an individual project."  TR at 706 (Sheppard).

During at least one of the in-person meetings that took place during February and March of 2004, Joseph Giuliano, CBP's Deputy Chief for the Washington Border Patrol Sector, was "screaming and hollering at Steve [Saepoff]," because he was upset about how long it was taking to construct both projects.  TR at 679 (Sheppard); *see also* TR at 485-86 (Fashimpaur).

### G.   On March 11, 2004, The Army Corps Of Engineers' Project Manager And Technical Representative Sent An E-mail To Plaintiff.

On the morning of March 11, 2004, the Army Corps' Project Manager and Technical Representative had a telephone conference with NASCENT (TR at 490-99 (Fashimpaur)), wherein he instructed NASCENT that any savings in constructing both projects in NASCENT's January 28, 2004 proposal should be reflected in Schedule B (Lynden Project), as well as in Schedule C.  TR at 296-300 (Saepoff).  In other words, the Schedule A and B bids were supposed to add up to the same amount as the Schedule C bid.  TR at 296-97 (Saepoff).  In addition, the Army Corps advised NASCENT to "maximum [sic] their profit on Schedule A . . . to make sure that they were whole on Schedule A" in case only the Blaine Project was built.  TR at 299 (Saepoff); *but see* TR at 489-91 (Fashimpaur) (testifying that by making the requested modifications, NASCENT understood that it was guaranteed to be "awarded both the Blaine and Lynden projects.").

---

Participants on behalf of NASCENT included Fashimpaur and Dennis "Rusty" Sheppard, Co-Manager of the NASCENT Group.  TR at 286-87 (Saepoff); TR at 473-74 (Fashimpaur).

Later that day, the Army Corps sent a follow-up e-mail to NASCENT, that read:

> Based on our conversation, here is the list of alternatives that we have accepted and rejected.  I have added [one item].  Please provide a proposed price [for the new item].
>
> Please provide a revised bid schedule per the RFP.  *Consider the Blaine bid schedule (Schedule A) as the Basic Bid and the Lynden bid schedule (Schedule B) as an optional bid item.*  Include a version of the attached spreadsheet that Sharon Gonzalez can sign acceptance [sic] as the Contracting Officer.
>
> As soon as I have the revised bid schedule, I can start the award process here.

JX 36 at COE 032044 (emphasis added); *see also* TR at 779 (Gonzalez).

NASCENT's Project Manager's recollection was "very clear" that NASCENT would be awarded both projects.  TR at 490-91 (Fashimpaur).  The Army Corps Project Manager and Technical Representative, however, testified that he never told any representative of NASCENT, during in-person or telephonic meetings, that the Army Corps would award NASCENT the Lynden Project, because he did not have the authority to award projects.  TR at 287-88 (Saepoff); *see also* TR at 643 (Newby); TR at 800 (Gonzalez).

It appears that later in March 2004, NASCENT employees met with the Army Corps' staff in Seattle.  TR at 508 (Fashimpaur).  At that meeting, the Army Corps was provided with a copy of NASCENT's bid estimate template and construction schedule that typically would only be disclosed during the design and build process, after a contract was formed.  TR at 508-510 (Fashimpaur).

### H.   On March 16, 2004, Plaintiff Sent A Facsimile To The Army Corps Of Engineers, Submitting A Price Of $6,466,717 For The Blaine Project.

On March 16, 2004, NASCENT responded to the Army Corps' March 11, 2004 e-mail by transmitting by facsimile a "second revised proposal in response to the RFP."  Jt. Stip. No. 27; *see also* JX 38; TR at 584 (Fashimpaur).  The attached cover letter stated that:

> Per [the Army Corps Project Manager and Technical Representative's] directive, the amount of savings offered by NASCENT for a combined Blaine and Lynden award was credited to the Lynden Project and is reflected in the TOTAL SCHEDULE B amount.  Accordingly, *the savings offered is contingent on simultaneous award* and complete execution of both projects.

JX 38 at COE 1059 (emphasis added).

NASCENT's March 16, 2004 facsimile reduced the January 28, 2004 proposed price of $4,795,009 for the Lynden Project to $4,439,147, *i.e.*, a decrease of $355,862.  *Compare* JX 38

8

at COE 1061, *with* JX 29 at COE 1079.  This $355,862 reduction for the Lynden Project represented "the cost savings that [NASCENT was] able to offer the [Army Corps] based off of doing the combined projects."  TR at 500 (Fashimpaur).  NASCENT, however, also increased the proposed price for the Blaine Project from $6,427,054 in the January 28, 2004 proposal to $6,466,717 in the March 16, 2004 proposal — an increase of $39,663, reflecting additional tasks that the Army Corps requested during "value engineering."  *Compare* JX 29 at COE 1078 (January 28, 2004 proposal), *with* JX 38 at COE 1060 (March 16, 2004 proposal); *see also* TR at 523 (Fashimpaur) (testifying that the "$39,000 reflects" the "adds and deducts for the Blaine project").

On March 17, 2004, the Army Corps' Project Manager and Technical Representative sent an e-mail to an Army Corps Program Manager, requesting a "PR&C in the amount of $6,466,717 for a contract award for this project."  JX 42.[5]  Two days later, the Army Corps' Project Manager and Technical Representative requested that the Contract Specialist "award the Blaine Project" for $6,466,717 to NASCENT.  JX 42.  This amount was the same as NASCENT's proposed price for Schedule A (the Blaine Project only) in its March 16, 2004 proposal.  JX 38 at COE1060.

On April 16, 2004, NASCENT sent a letter to the Army Corps to confirm that:

> the terms and provisions included in our original *offer*, and subsequent revisions, is [sic] hereby extended to  of May 2004.  This is based on the immediate award of the Base bid: Blaine and the follow-up award of the *option*: Lynden by the end of May.  The competitive pricing that Nascent was able to offer the Corp [sic] of Engineers was based on the packaging of jobs, both design and construction.  Due to the volatile market industry wide on materials and shipping Nascent would ask for notice just prior to award of the option: Lynden to evaluate if Nascent has incurred costs that would have to be past [sic] on to the Government.

JX 47 (emphasis added).

**I.   On April 21, 2004, The Army Corps Of Engineers' CO Signed DD Form 1155, With Attachments, A Copy Of Which Was Found In Plaintiff's Files.**

On April 21, 2004, Deputy Director of Contracting, Susan Sherrell, electronically signed a DD Form 1155, Order for Supplies or Services, Contract DACA67-03-D-2011, Order 002, stating a total award amount of $6,466,717.  DX 54 at NASCO 001048; TR at 842-43 (Sherrell).[6]  The total amount awarded according to the DD Form 1155 was $6,466,717, *i.e.*, the

---

[5] The PR&C is the document that obligates funds after a CO makes an award.  TR at 306 (Saepoff).

[6] The DD Form 1155, together with six other attached pages, was discovered in NASCO's files.  TR at 328-32 (colloquy between the court and counsel).  The parties disagree regarding whether or not a CO customarily signed a DD Form 1155 prior to securing the contractor's signature.  NASCENT's Co-Manager testified that he had never seen a DD Form

amount of NASCENT's March 16, 2004 Schedule A proposal for the Blaine Project.  DX 54 at NASCO 001048.[7]

The last three pages of the April 21, 2004 document, called "ALTERATIONS IN CONTRACT," Form FAR 52.252-4, list four "Optional Items," with 0002 CLINs, the CLIN code for Lynden Project items, adding up to $4,439,147, *i.e.*, the same amount that NASCENT bid for the Lynden Project in the March 16, 2004 Schedule B (Lynden Project) bid.  *Compare* DX 54 at NASCO 001052, *with* JX 38 at COE 1061.

### J.  On April 22, 2004, The Army Corps Of Engineers Sent A "Notice Of Award Information" To Plaintiff By Facsimile.

On April 22, 2004, the Army Corps sent NASCENT a "Notice of award information" by facsimile.  JX 51.[8]

---

1155 that first was signed by the CO in the course of "hundreds" of orders.  TR at 683-84 (Sheppard).  The Army Corps' CO, however, testified that it was common practice for the Army Corps' COs to send such forms only with the signature of the CO.  TR at 836 (Gonzalez).

DX 54 is identical to two other versions of the same document (JX 50 and PX 67), except that DX 54 contains three additional pages that do not appear in JX 50 or PX67.  At trial, the parties stipulated that the additional pages in DX 54 were, in fact, attached to the April 21, 2004 DD Form 1155 discovered in NASCO's files.  TR at 330.  NASCO asserts that its "principals have never been able to identify when [DX 54] was received, and there has never been produced a signed [by NASCENT] copy. . . . [N]or is there any fax stamp associated with it or a cover letter enclosing it or any way to identify when it was actually provided to NASCO."  TR at 690 (colloquy between the court and NASCO's counsel).

[7] The DD Form 1155 used in the April 21, 2004 communication is an expired version of the form, published in January 1998.

[8] The first page, 01/19, is the facsimile cover page.  JX 51 at NASCO 001906.  The next page, 02/19, is missing from all copies in the record.  Jt. Stips. Nos. 37-40; JX 51; PX 68.  The Government speculates that the missing page was the DD Form 1155, signed by the Army Corps' Deputy Director of Contracting, that also was included as the first page in the April 21, 2004 communication.  Government's Post-Trial Brief at 21, 36.  The court declines to make any assumptions about the nature of a document that neither party has introduced into evidence.  Pages "03/19" through "05/19" set forth a schedule of services ordered and identify only the 0001 CLINs that correspond with NASCENT's March 16, 2004 Schedule A (Blaine Project).  JX 51 at NASCO 001907-09; JX 38 at COE 1060.  These pages are identical to pages 2-4 of the April 21, 2004 document.  DX 54 at NASCO 001049-51.  The schedule of services ordered on pages 03/19 through 05/19 does not include any of the 0002 CLINs for Schedule B (Lynden Project) or 0003 CLINs for Schedule C (both projects).  *Compare* JX 51 at NASCO 001907-09, *with* JX 13 at COE 0061-63 (original RFP); JX 38 at COE 1060-62 (NASCENT's March 16, 2004 facsimile to the Army Corps).  Pages 06/19-08/19 are the same "ALTERATIONS IN CONTRACT," Form FAR 52.252-4, as found at pages 5-7 of the April 21, 2004 DD Form 1155.

10

On April 23, 2004, NASCENT's Co-Manager sent an e-mail to several NASCENT employees announcing that NASCENT was awarded both the Blaine Project and the Lynden Project. PX 69; TR at 704-06 (Sheppard).

On April 26, 2004, the Army Corps sent letters to the other two offerors. DX 57; DX 58. Both letters stated that the: "Total task order price is $6,466,717." DX 57; DX 58. This is the same price proposed by NASCENT in the March 16, 2004 proposal for the Blaine Project only. JX 38 at COE1060.

On May 7, 2004, an architect with Shaw-Beneco, NASCENT's joint venture partner, sent an e-mail to the SmithGroup, a NASCENT subcontractor, stating, "[w]e are still optomistic [sic] that Lynden [Project] will be awarded before the end of the month." JX 55; TR at 620 (Fashimpaur).

### K.   In May 2004, The Army Corps Of Engineers And Plaintiff Agreed To Bilateral Modification No. 1.

In early May 2004,[9] the parties entered into bilateral Modification No. 1 that provided: "The Government may increase the quantity of work awarded by exercising the Optional Bid Item Numbers at any time, *or not at all*, but no later than 90 calendar days after receipt by Contractor of notice to proceed for the Base Items." JX 60 at COE 1361 (emphasis added).

---

*Compare* JX 51 at NASCO 001910-12, *with* DX 54 at NASCO 001052-54. These pages clearly list the 0002 (Lynden Project) CLINs as "optional items." JX 51 at NASCO 001910.

Page "09/19" of the April 22, 2004 facsimile is another DD Form 1155 Order for Supplies or Services, but it differs in several ways from the DD Form 1155 that was part of the April 21, 2004 document. *Compare* JX 51 at NASCO 001913, *with* DX 54 at NASCO 001048. First, the April 22, 2004 facsimile used a more recent version of the DD Form 1155, published in December 2001 (as opposed to the 1998 version used in the April 21, 2004 communication). JX 51 at NASCO 001913. The 2001 version of the DD Form 1155 states that "previous editions [are] obsolete." JX 51 at NASCO 001913. Second, unlike the April 21, 2004 DD Form 1155 that was never signed by any NASCENT representative (DX 54 at NASCO 001048), the April 22, 2004 DD Form 1155 is signed by NASCENT's Co-Manager on behalf of NASCENT. JX 51 at NASCO001913. Third, the April 22, 2004 DD Form 1155 contains only Sherrell's typewritten name in the CO's signature block, whereas the April 21, 2004 DD Form 1155 shows her signature. *Compare* JX 51 at NASCO 001913, *with* DX 54 at NASCO 001048. Fourth, the April 22, 2004 DD Form 1155 does not contain a PR&C number in Block 4 ("Requisition/Purch Request No.") or any information in Block 15 (entitled "Payment Will Be Made By:"). JX 51 at NASCO 001913.

Page "10/19" of the facsimile is a copy of NASCENT's April 16, 2004 letter, which is discussed above. *Compare* JX 51 at NASCO001914, *with* JX 47. The remaining pages are not relevant to the dispute between the parties.

[9] Modification 1 had an "effective date" of May 3, 2004. JX 60 at COE 1357.

Modification No. 1 also states that "[i]n consideration of this modification agreed to herein as complete and equitable adjustment, the contractor hereby releases the Government from any and all liability from further equitable adjustments to such facts or circumstances giving rise to this modification." JX 60 at COE 1358.

### L.   On May 10, 2004, A Notice To Proceed Was Issued Regarding The Blaine Project.

On May 10, 2004, a Notice To Proceed was issued for "Project Title: U.S. Customs and Border Patrol Protection Station and Sector Headquarters *Blaine and Lynden*, Washington." JX 57 (emphasis added). NASCENT signed the Notice to Proceed and began work on the Blaine Project. Jt. Stip. Nos. 47-48; TR at 619 (Fashimpaur). The CO, however, never issued a *separate* Notice To Proceed for Lynden. Jt. Stip. No. 49. At trial, NASCENT's Project Manager testified that he understood the Notice To Proceed applied to both the Blaine Project and the Lynden Project, but that construction would start first on the Blaine Project, as it was the Border Patrol's first priority at the time. TR at 617-18 (Fashimpaur). At trial, NASCENT's Co-Manager testified that he understood the May 10, 2004 Notice To Proceed to apply only to the Blaine Project, but failed to provide any coherent explanation as to why he thought this. TR at 725-26 (Sheppard). Mr. Sheppard testified, however, that Giuliano, the Border Patrol's Sector Deputy Chief, indicated that Blaine was more important to him, because his office was to be located there. TR at 726-27 (Sheppard). Giuliano testified in his videotaped deposition that the two projects were equally important to him. PX 133 at 114-15.

On or around May 19, 2004, the Army Corps Project Manager and Technical Representative was promoted to a new position within the Army Corps. TR at 227 (Saepoff). Subsequently, Miriam Gilmer took over as Project Manager for the Blaine and Lynden projects. PX 77.

On June 22, 2004, an employee from the SmithGroup, one of NASCENT's subcontractors, sent an e-mail to NASCENT's Project Manager inquiring "what the status of the Lynden project [is] and if it is going to happen." PX 84. The response was: "We[']re finalizing negotiations with Home Land [sic] Security right now. Sometime next week we should know something." PX 84. At his deposition, NASCENT's Project Manager testified that NASCENT understood that, at the time, the Army Corps was "working on getting funding and trying to be able to get the project going." TR at 624 (Fashimpaur's deposition). He also testified that, if funding was not obtained, the Lynden Project could not go forward. TR at 624-625 (same). At trial, however, he indicated that he understood that Lynden had already been awarded to NASCENT. TR at 623-624 (Fashimpaur).

On July 2, 2004, the new Army Corps Project Manager sent an e-mail to NASCENT advising that "[t]here have been some personnel changes at the DHS resulting in a change in the submittals distribution list for the Blaine and eventually Lynden projects." PX 86.

On July 14, 2004, the NASCENT's sent an e-mail to the new Army Corps Project Manager, attaching a letter from NASCENT's Project Manager advising:

> As requested on July 14, 2004 call [sic], the attached proposal information is provided for your review and subsequent option award of contract for the above reference [sic] project. This pricing reflects costs projected to October 1, 2004 and will be applicable to this date. Due to the volatile market, quick *award* of this project allows us to maintain the *proposed* costs.

Jt. Stip. No. 54; JX 62 at COE 015962 (emphasis added). The letter concludes: "Thank you for the opportunity to submit this *proposal*." JX 62 at COE 015962 (emphasis added); Jt. Stip. No. 54; *see also* Jt. Stip. No. 58 ("The [Army Corps] never *accepted* NASCENT's July 14, 2004 *proposal*.") (emphasis added).

On May 5, 2005, the Army Corps Deputy Director for Contracting sent an e-mail to the new Army Corps Project Manager and other Army Corps employees inquiring "what is happening with the Nascent contract?" PX 105 at COE 032462 (indicating "some concerns just reading the task order"). At trial, the Army Corps Deputy Director for Contracting could not remember what her concerns were. TR at 849 (Sherrell). The Army Corps' Project Engineer, or its Resident Engineer, for the Blaine Project and the Lynden Project responded enclosing an April 5, 2005 Memorandum with the title "NASCENT Economic Adjustment Issue." PX 105 at COE 032463. The April 5, 2005 Memorandum states: "Delivery Order 0002 signed/dated April 1, 2004, but not signed. Contract total $10,905,864." PX 105 at COE 032463. This Memorandum also stated "Delivery Order 0002 signed/dated April 21, 2004. Contract total of $6,466,717.00. This DD Form 1155 had attached sheets with some revisions to scope." PX 105 at COE 032463.

On May 5, 2005, the new Army Corps Project Manager also responded, enclosing a copy of NASCENT's March 16, 2004 proposal and a copy of NASCENT's April 16, 2004 letter regarding the Lynden Project. PX 106.

On August 3, 2005, CBP occupied the Blaine facility after executing a Certificate of Beneficial Occupancy. PX 108. The Army Corps has not suggested that NASCENT's performance on the Blaine Project was in any way defective.

In the late summer/early fall of 2005, NASCENT's Project Manager and in-house counsel for Shaw-Beneco decided to compute the damages to which they believed NASCENT was entitled as a result of the Army Corps' purported breach of contract. PX 109, 111; TR at 547 (Fashimpaur).

On or around September 21, 2005, NASCENT sent a letter to the CO to offer to construct the Lynden Project. Jt. Stip. No. 65. The Army Corps did not respond. Jt. Stip. No. 67.

On July 31, 2007, Shaw-Beneco assigned "all right, title and interest in and to any and all claims and chose an action which NASCENT Group, J.V., has, had or may have in the future

against the United States Army Corps of Engineers arising out of or related to U.S. Customs and Border Protection Sectors Blaine and Lynden, Contract No. DACA67-03-D-2011, RFP No. 0017, Solicitation No. W912DR-04-T-2101 to fellow member and joint venturer, Native American Services Corps." PX 121.

On August 1, 2007, NASCO submitted a Claim For Money Damages to the relevant Army Corps CO.  Am. Compl. ¶ 50 & Ex. Q.  On November 5, 2007, the Army Corps CO advised NASCO that a final decision "would be sent on May 12, 2008." Am. Compl., Ex. R.

In April 2008, the Army Corps CO requested further information that NASCO provided on April 25, 2008.  Am. Compl., Ex. S.  NASCO, however, alleges that no final decision has issued on its August 1, 2007 Claim and that the Army Corps failed to respond to "Plaintiff's counsel's repeated requests for a status on the claim . . . ." Am. Compl. ¶ 55.

## M. The Army Corps Of Engineers' Attempts To Secure Funding For The Lynden Project.

From February through April of 2004, the Army Corps and CBP attempted to secure funds for the Lynden project.   JX 31 at COE 015922; JX 32 at COE 015924; JX 34; JX 35; JX 41; JX 43 at COE 015937; DX 42; DX 46; DX 48; TR at 313-14, 315-17 (Saepoff). Reprogramming funds from the Blaine Project, which apparently was overfunded, to the Lynden Project, frequently was discussed, but the Army Corps had no authority to reprogram without DHS's consent.  TR at 128-33, 151-53 (Saepoff).

On February 4, 2004, Giuliano requested to transfer $1 million from the Blaine Project to the Lynden Project.  JX 31 at COE 015922-23; JX 32 at 015924-25.  In addition, the Army Corps Project Manager and Technical Representative also discussed the need for more funds with Chien Le, DHS's Director of Facilities.  TR at 313-14 (Saepoff).  The Director of Facilities, in turn, forwarded Giuliano's February 4, 2004 e-mail to Ben Case, the Army Corps Program Manager in the Fort Worth District (JX 32 at 015924), where all DHS projects are managed.  *See* TR at 61 (Saepoff).  Case was the Army Corps employee responsible for liaising with DHS regarding funding issues, including regarding the possible reprogramming of excess Blaine funds to underwrite the construction of the Lynden facility.  TR at 129-31 (Saepoff).  DHS's Director of Facilities indicated to the Army Corps Program Manager that it was difficult to secure additional funds at that time.  JX 32 at COE 015924.

On February 27, 2004, the Army Corps Project Manager and Technical Representative sent an e-mail to various Army Corps personnel, including the Army Corps Program Manager, indicating that additional funds were required for the Lynden Project, and that he would be requesting that DHS reprogram funds from the Blaine Project to the Lynden Project and provide additional funds for Lynden.  JX 34.  On March 2, 2004, he also e-mailed DHS about the viability of reprogramming funds and/or securing more funding for the Lynden Project. JX 35; TR at 315-17 (Saepoff).  On March 18, 2004, after receiving NASCENT's March 16, 2004 facsimile, the Army Corps Project Manager and Technical Representative requested $1,458,000 in additional funds that would be needed to award the Lynden Project to NASCENT at the

proposed price. JX 41; TR at 318 (Saepoff). On March 24, 2004, the Army Corps Program Manager requested that DHS "fully fund the [Lynden] Project and allow award." DX 42. On March 26, 2004, the Army Corps Project Manager and Technical Representative changed the amount of additional funds needed to complete the Lynden Project to $1,542,000. JX 43.

Throughout April 2004, the Army Corps continued to attempt to reprogram funds from the Blaine Project to the Lynden Project. JX 45; DX 48; TR at 321-23 (Saepoff). On April 6, 2004, the Army Corps Program Manager sent an e-mail to the Army Corps Project Manager and Technical Representative asking if Blaine was sufficiently under budget as to allow for more than $500,000 to be reprogrammed from the Blaine Project to the Lynden Project if DHS were to grant permission to reprogram and/or if there were any pieces of the Lynden project that could be withheld until the following year. JX 45; TR at 321-23 (Saepoff). That same day, an Army Corps employee in Case's office sent an e-mail to George Hutchinson and Thomas Diaforli, both CBP Logistics Management Specialists, asking about the possibility of reprogramming funds. DX 48. Diaforli responded that reprogramming was problematic because the DHS spending plan to be presented to Congress for approval did not reference the Lynden Project. Id.

The parties dispute whether the Army Corps advised NASCENT that funding was available for the Lynden project. At trial, NASCENT's Project Manager testified that the Army Corps' Project Manager and Technical Representative represented that there was funding for the Lynden Project. TR at 613-14 (Fashimpaur).[10] NASCENT's Co-Manager indicated that some individuals from CBP represented that "they needed to get more money, but that was not a problem. It was coming right away." TR at 709 (Sheppard).

Long after construction began on the Blaine Project, the Army Corps continued its attempts to secure funding from DHS to award the Lynden Project. See DX 65; DX 98. On July 21, 2004, the new Army Corps Project Manager sent an e-mail to the Army Corps Program Manager requesting additional funds for Lynden, together with an attached spreadsheet detailing the costs. DX 65. In response, the Army Corps Program Manager sent an e-mail to Richard Hanlon, CBP's Program Manager, Portfolio Management Division, discussing the need for additional funding. Id. On August 23, 2005, the Army Corps Program Manager e-mailed the Army Corps Project Manager stating that $2.4 million had been received for the Lynden Project. DX 98. On March 20, 2006, the new Army Corps Project Manager sent an e-mail to Lynn Daniels, the Army Corps' Seattle District Program Manager for Interagency & International Services, stating that the $2.4 million had been received by that the Army Corps was still waiting

---

[10] In the June 25, 2010, deposition, he states the opposite. TR at 614 (counsel reading Fashimpaur's deposition); see also TR at 459-60 (Fashimpaur asserting that he knew that there was a limited budget for Lynden and that NASCENT was trying to get its bid within the Army Corps' budget). NASCENT's Project Manager explained during his deposition that he had not reviewed all the files involved in the transaction at the time of his deposition, but a subsequent review refreshed his memory. TR at 615 (Fashimpaur). He did not mention any document—nor has NASCENT directed the court's attention to any document—that Fashimpaur subsequently viewed indicating that the Army Corps ever assured NASCENT more than $3.3 million was available to build the Lynden Project.

for an additional $1 million for the construction of Lynden.  DX 98.  Therefore, it appears that adequate federal funds were never allocated for the Lyndon Project, as late as March 2006.  DX 96; DX 98.

## II.    PROCEDURAL HISTORY.

On February 17, 2009, NASCO filed a Complaint ("Compl.") in the United States Court of Federal Claims alleging that the Army Corps breached a Contract with NASCENT, by not permitting construction to commence on the Lynden project, and this breach caused NASCENT to suffer direct and consequential damages.  Compl. ¶¶ 40-41.

On April 8, 2009, the Government filed an Unopposed Motion For Extension Of Time To File [An] Answer that the court granted on April 9, 2009.  The Government filed an Answer on May 29, 2009.

On June 8, 2010, the court approved the parties' June 4, 2010 Joint Motion For Protective Order.

On October 7, 2010, at a telephone status conference, NASCO made an oral motion requesting that the court compel the Government to produce seven documents withheld as privileged.  On October 21, 2010, the Government provided the seven documents to the court for *in camera* review.  On November 4, 2010, the court ordered all these documents be produced, with redactions proposed by the Government.

On March 7, 2011, the court issued a Scheduling Order setting this case for trial from April 26, 2011 through April 29, 2011, in Seattle, Washington.  On March 25, 2011, both parties advised the court of proposed exhibits and witnesses for use at trial.

On March 25, 2011, the Government filed a Motion For Summary Judgment, together with Proposed Findings Of Uncontroverted Facts.  On that same date, NASCO filed a Cross-Motion For Summary Judgment, together with a Statement Of Facts and a Motion *In Limine* To Exclude The Expert Testimony Of Kevin O. Williams, the Government's proposed expert witness.  During a telephone pre-trial conference on March 30, 2011, the court denied Plaintiff's Motion *In Limine*.

On April 1, 2011, the parties filed a Joint Stipulation Of Fact.

On April 8, 2011, NASCO filed a Petition For Issuance Of A Writ Of Habeas Corpus Ad Testificandum, Pursuant To 28 U.S.C. §§ 1651(a) And 2521(c).  This Petition requested that the court order Mr. Joseph Giuliano, CBP's former Sector Deputy Chief, to appear and testify at trial on April 27, 2011.  On April 12, 2011, instead of granting a writ of habeas corpus, the court granted the parties leave to depose Mr. Giuliano.[11]

-----

[11] Mr. Giuliano currently is incarcerated for violation of federal laws not relevant to this case.  Terance Perry deposed Mr. Giuliano for the Plaintiff and Daniel Volk defended the

On April 8, 2011, NASCO filed a Motion To Amend The February 17, 2009 Complaint to add an additional claim that the parties formed a contract on March 16, 2004, via NASCENT's facsimile sent that same day, that subsequently was breached by the Army Corps. Am. Comp. ¶¶ 84-86.  The Amended Complaint also added a claim for breach of the implied covenant of good faith and fair dealing.  Am. Compl. ¶¶ 98-100.

On April 11, 2011, the court granted NASCO leave to file an Amended Complaint that was entered in the court's docket on April 12, 2011.  On April 19, 2011, the Government filed an Answer denying liability for the new added causes of action.

From April 26, 2011 until April 28, 2011, trial was held in Seattle, Washington.

On June 17, 2011, the parties filed a Joint Motion For Leave To Exceed Page Limits Of Post-Trial Briefs And Reply Briefs By 20 Pages, which the court granted on June 20, 2011.

On June 24, 2011, NASCO and the Government filed Post-Trial Briefs ("Pl. Br." and "Gov't Br.," respectively).

On July 21, 2011 NASCO filed an Unopposed Motion To Amend Caption, Pursuant To RCFC 15(b) and 17(a), explaining that the caption of this case should be changed to name the Plaintiff as "The NASCENT Group, J.V. by Native American Services Corporation, Inc." to reflect that the NASCENT Group was the actual party in interest, although the suit was filed by NASCO, a member of the joint venture, as the assignee of all claims thereunder.  The Government did not file any objection.

On July 22, 2011, the Government and NASCO filed Post Trial Reply Briefs ("Pl. Reply" and "Gov't Reply," respectively).

## III.   JURISDICTION.

The jurisdiction of the United States Court of Federal Claims is established by the Tucker Act.  *See* 28 U.S.C. § 1491.  The Tucker Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists."  *United States* v. *Testan*, 424 U.S. 392, 398 (1976).  Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal

---

deposition for the Government.  On June 6, 2011, Mr. Giuliano's video deposition testimony was admitted at trial as PX 131 and the transcript of the deposition was admitted into evidence by a June 6, 2011 Order as PX 133.

statute, or executive agency regulation that provides a substantive right to money damages.  *See Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.").  The burden of establishing jurisdiction falls on the plaintiff.  See *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the plaintiff to allege facts sufficient to establish jurisdiction); *see also* RCFC 12(b)(1).

The April 12, 2011 Amended Complaint alleges that NASCO is entitled to money damages for breach of the Contract formed, either on March 16, 2004 or April 22, 2004, between NASCENT and the Army Corps.  Am. Compl. at ¶¶ 73, 85.  Since NASCO, a party to the NASCENT Joint Venture, alleges that it has been assigned all rights to any damages arising under the contract, the court hereinafter will refer to NASCO as the Plaintiff in this case.  Am. Compl. at ¶¶ 82, 95.  Accordingly, the court has determined that the April 12, 2011 Amended Complaint alleges sufficient facts to satisfy the jurisdictional requirements of the Tucker Act.  *See* 28 U.S.C. § 1491(a)(1) (2006).

The mandatory requirements of the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601–13 (2006),[12] must also be satisfied before the court has subject matter jurisdiction.  *See B.D. Click Co., Inc.* v. *United States*, 1 Cl. Ct. 239, 241 (1982) ("The plaintiff [must] produce or cite . . . evidence establishing either that it submitted a written claim to the contracting officer or that the contracting officer rendered a final decision.").  Pursuant to the CDA, a plaintiff must submit a written and certified claim to the CO and obtain a final decision before the United States Court of Federal Claims has subject matter jurisdiction.  *See M. Maropakis Carpentry, Inc.* v. *United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (CDA jurisdiction "requires both a valid claim and a contracting officer's final decision on that claim").  Although the CDA does not define the term "claim," the United States Court of Appeals for the Federal Circuit has stated that a "claim" is a "'written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain.'"  *England* v. *Swanson Grp., Inc.*, 353 F.3d 1375, 1380 (Fed. Cir. 2004) (quoting 48 C.F.R. § 2.201).  For claims over $100,000, the failure of a federal contracting entity to "issue a decision" or "notify the contractor of the time within which a decision will be issued," within sixty days of receipt of the claim is "deemed to be a decision by the contracting officer denying the claim[.]"  41 U.S.C. § 605(f)(2),(5) (2006).

For claims over $100,000, Congress requires that "the contractor . . . certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for

_____

[12]  Effective January 4, 2011, Congress amended certain provisions of the CDA, and recodified the Act, as amended, at 41 U.S.C. §§ 7101–7109.  *See* Public Contracts Act of Jan. 4, 2011, Pub. L. No. 111–350, § 3, 124 Stat. 3677, 3816–26 (2011).  Although the Public Contracts Act repealed 41 U.S.C. §§ 601–13, any "rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act" are still governed by these sections of the United States Code.  Pub. L. No. 111–350, § 7, 124 Stat. at 3855.

which the contractor believes the [G]overnment is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 605(b)(1) (2006).

In this case, on July 31, 2007, NASCENT assigned its rights under the Blaine and/or Lynden Contract to NASCO. Am. Compl. ¶¶ 82, 95; PX 121. On August 1, 2007, NASCO filed a Claim For Money Damages to the CO, together with a claim for a sum certain and request for the CO's final decision. Am. Compl. ¶ 50 & Ex. Q. The August 1, 2007 claim contains an authorized certification that the claims were made in good faith, that the supporting data are accurate, and that the amount requested accurately reflects the contract adjustment for which NASCO asserted the Government was liable. Am. Compl., Ex. Q at 7. On November 5, 2007, the Army Corps CO advised NASCO that a final decision "would be sent on May 12, 2008." Am. Compl., Ex. R. In April 2008, the Army Corps CO requested further information, that was submitted on April 25, 2008. Am. Compl., Ex. S. Accordingly, the April 12, 2011 Amended Complaint alleges that no final decision was rendered on the August 1, 2007 claim and that the Army Corps failed to respond to "Plaintiff's counsel's repeated requests for a status on the claim[.]" Am. Compl. ¶ 55. As such, NASCO's claims are deemed denied, as a matter of law. *See* 41 U.S.C. § 605(f)(5) (2006) ("Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter.").

For these reasons, the court has determined that the April 12, 2011 Amended Complaint has satisfied the jurisdictional prerequisites of the Tucker Act and the CDA, requiring the court to adjudicate the claims alleged therein.

## IV.   STANDING.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted).

The April 12, 2011 Amended Complaint alleges that NASCENT entered into a contract with the Army Corps and that the breach thereof requires an award of money damages, *i.e.*, "lost profit, shifted costs and overages." Am. Comp. ¶ 73; *see also id.* ¶¶ 75-81 (expanding upon damages suffered by Plaintiff as a result of the breach). Therefore, the Amended Complaint has alleged injury in fact that can be redressed by an adjudication requiring that the Army Corps pay damages.

Accordingly, for the aforementioned reasons, the court has determined that NASCENT has standing to seek an adjudication of the claims alleged in the April 12, 2011 First Amended Complaint.

## V.   DISCUSSION.

### A.   Whether The Army Corps Of Engineers' March 11, 2004 E-Mail Was An Offer That Plaintiff Accepted By A March 16, 2004 Facsimile.

#### 1.   The Plaintiff's Argument.

NASCENT argues that the Army Corps' Project Manager and Technical Representative's March 11, 2004 e-mail and conversation on the same day with NASCENT's Project Manager and NASCO's Co-Manager offered "both [the] Blaine [Project] and [the] Lynden [Project] to NASCENT[,] if NASCENT performed certain obligations," *i.e.*, submit a revised proposal.  Pl. Br. at 45.  NASCENT, however, recognizes that it must establish that this individual must have authority to bind the Army Corps and therefore argues that he had *implied* actual authority and/or, that his actions were ratified by the CO, who had actual authority to bind the Army Corps.  Pl. Br. at 44-45, 51-54.

NASCENT argues that an "integral part" of the Army Corps Project Manager and Technical Representative's duties was the authority to acquire real estate and negotiate contract modifications for programmatic and funding approval.  Pl. Br. at 52; Pl. Reply at 18.  He also was authorized to negotiate contract terms with HDR, the Army Corps' principal architecture and engineering firm.  TR at 83-84 (Saepoff).  These duties evidence that the Army Corps Project Manager and Technical Representative had implied actual authority to bind the Army Corps.

Moreover, this individual's actions were ratified by the CO.  Pl. Br. at 53-54; Pl. Reply at 18-19.  The CO ratified the Army Corps Project Manager and Technical Representative's offer to construct the Blaine Project and Lynden Project, because she "told NASCENT she looked forward to working with it on these projects" and she "saw" the March 11, 2004 e-mail, and NASCENT's March 16, 2004 response.  Pl. Br. at 53-54.[13]  In addition, the CO was present during "value engineering" discussions in February and March of 2004.  TR at 491-92 (Fashimpaur); TR at 763-64 (Gonzalez).  Ms. Gonzalez also supervised the Army Corps' April 22, 2004 facsimile that NASCENT views as having granted both the Blaine and Lynden Projects. Pl. Br. at 54.  Collectively, these actions show that Ms. Gonzalez, in her capacity as CO, ratified NASCO's March 11, 2004 offer, so that a contract was formed by NASCENT's March 16, 2004 facsimile response.  Pl. Br. at 54.

---

[13] The March 16, 2004 facsimile also manifests acceptance of the Army Corps' March 11, 2004 offer.  Pl. Br. at 46 (citing PX 55 at COE 1059 (stating that "the attached value engineering proposal information is provided for your review and subsequent award of contracts for the above reference [sic] projects")).

## 2.      The Government's Response.

The Government rejects NASCO's argument that the Army Corps made an offer regarding the Lynden Project. Gov't Br. 46-49; Gov't Reply 11-12. As a factual matter, the Army Corps never made a verbal offer to build both facilities. TR at 181-82 (Saepoff); TR at 800 (Gonzalez); TR at 643 (Newby). Moreover, as a matter of law, the Army Corps Project Manager and Technical Representative had no authority to enter into a binding contract for the Army Corps, because he did not have a federal warrant and knew that funds had not been authorized for the Lynden Project. Gov't Br. at 46-49; Gov't Reply at 11 (citing TR at 180-81, 252-55, 287-88, 291 (Saepoff)).

In addition, the March 11, 2004 Army Corps' e-mail could not be interpreted as an offer to construct the Lynden Project, as a matter of law, because NASCENT was asked to submit a revised bid schedule "per the RFP" and specifically was advised that the Lynden Project was an "optional bid item." JX 36 at COE 032044. In addition, this e-mail required that NASCENT provide an additional price term. JX 36 at COE 032044 ("Please provide a proposed price to item 37a."). Therefore, any response necessarily was not an offer, as it was indeterminate. Gov't Reply at 12-13.

Finally, NASCENT's March 16, 2004 facsimile cannot reasonably be characterized as an acceptance to build both the Blaine and Lynden Projects, because it was identical to previous NASCENT proposals. *Compare* JX 38 (March 16, 2004 facsimile), *with* JX 24 (Dec. 16, 2003 proposal); JX 29 (Jan. 28, 2004 proposal). Moreover, NASCO stipulated that the March 16, 2004 facsimile was a response to the RFP, and not an offer. Jt. Stip. No. 27 ("On March 16, 2004, NASCENT submitted a second revised *proposal* in response to the RFP.") (emphasis added). Both bids in the March 16, 2004 facsimile were meant to stand on their own. TR at 585 (Fashimpaur). In other words, an offeror could bid to construct one or both facilities, but any bid was not an acceptance, nor binding commitment of an offeror to construct both projects. Gov't Reply at 9. The pricing structure set forth in the March 16, 2004 facsimile also evidenced that the Blaine Project was a separate offer, because any savings from combining the projects would be priced into the Lynden Project. JX 38 at COE 1059 ("Per your directive, the amount of savings offered by NASCENT for a combined Blaine and Lynden award was credited to the Lynden Project and is reflected in the TOTAL SCHEDULE B amount.").

## 3.      The Court's Resolution.

### a.      The Army Corps Of Engineers' March 11, 2004 E-Mail Was Not An Offer.

The United States Court of Appeals for the Federal Circuit recently held that "[a]n express contract with the government requires proof of mutual intent to contract, including an offer, an acceptance, and consideration," as well as ratification by a government official with actual authority. *See Chattler* v. *United States*, 632 F.3d 1324, 1330 (Fed. Cir. 2011) (internal citations and quotation marks omitted).

The Army Corps' March 11, 2004 e-mail required that NASCENT "provide a revised bid schedule *per the RFP*" and "[c]onsider the Blaine bid schedule (Schedule A) as the Basic Bid and the Lynden bid schedule (Schedule B) as an *optional bid item*." JX 36 at COE 032044 (emphasis added). By its terms, this e-mail was not an offer to construct the Lynden Project.

The term "option" is defined in the FAR as "a unilateral right in a contract by which, for a specified time, the Government *may elect* to purchase additional supplies or services called for by the contract, or may elect to extend the term of the contract." 48 C.F.R. § 2.101 (emphasis added). Therefore, the March 11, 2004 e-mail solicited a bid for the Blaine Project, with the Lynden Project as an "optional bid item," *i.e.*, an item that the Army Corps "may elect to purchase" in the future. *Id.* Moreover, the Army Corps Project Manager and Technical Representative's statement that "[a]s soon as I have the revised bid schedule, I can start the award process here," could not be understood by a reasonable contractor to be an "offer," but a statement that once the revised bids were received, the Army Corps would begin to evaluate the bids. *See* JX36 at COE 032044.

In addition, Modification 1 provides that "[t]he Government may increased the quantity of work awarded by exercising the Optional Bid Item Numbers at any time, or not at all, but no later than 90 calendar days after receipt by Contractor of notice to proceed for the Base Items." JX 60 at COE 1361. NASCO's suggestion that this document allowed the Army Corps to "add back" items deleted during the "value engineering" discussions (TR at 724 (Sheppard)) is contrary to the plain language of the Modification that unambiguously refers to the "Optional Bid Item Numbers" and distinguishes them from the "Base Items," using terminology identical to that in Army Corps' March 11, 2004 e-mail (JX 36 at COE 032044 ("Consider the . . . Lynden bid schedule (Schedule B) as an optional bid item[.]")), as well as in the April 21, 2004 and April 22, 2004 facsimiles (DX 54 at NASCO 001052; JX 51 at NASCO 001910).

In addition, the March 11, 2004 e-mail requires that any revised bid schedule be submitted "per the RFP." JX 36 at COE 032044. The RFP, in boldfaced, capitalized letters stated that "THE TOTAL AMOUNT OF FUNDS AVAILABLE FOR DESIGN AND CONSTRUCTION [FOR LYNDEN] IS $3,100,00." JX 13 at COE 0063. Although this amount subsequently was increased to $3,300,000 (JX 19 at COE 00522), it remained lower than *any* offer that NASCENT made regarding Lynden Project. JX 24 at COE 1069 (Dec. 16, 2003 bid for $3,858,419); JX 29 at COE 1079 (January 28, 2004 bid for $4,795,009); *see also* JX 38 at 1061 (March 16, 2004 offer for $4,439,147). Given the Army Corps' instructions to submit a new bid "per the RFP," a reasonable contractor could not construe this as a representation the Army Corps had obtained sufficient funds to build Lynden.

Moreover, Mr. Saepoff had no authority to make *any* offer to NASCENT, because he was not a contracting officer. Nor did he have implied actual authority. *See Winter* v. *Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007) ("[A]n agent must have actual authority to bind the government. Such actual authority may be express or implied from the authority granted to that agent." (citation omitted)). The United States Court of Appeals for the Federal Circuit has held that implied actual authority arises only when such authority "'is considered to be an integral part of the duties assigned to a Government employee.'" *H. Landau & Co.* v. *United*

*States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (quoting J. CIBINIC & R. NASH, FORMATION OF GOVERNMENT CONTRACTS 43 (1982) (alteration omitted)).  NASCO has failed to establish that authorizing construction contracts was "integral" to Saepoff's job responsibility as a Corps Project Manager.  Instead, the evidence demonstrated that Ms. Gonzalez was an Army Corps CO.  And, for this reason she was present during all or most relevant meetings with NASCENT personnel.  TR at 491-92 (Fashimpaur); TR at 776-78 (Gonzalez).  Therefore, the fact that Mr. Saepoff was authorized to enter task orders with HDR, a long-term Corps subcontractor, is not dispositive.  *See Zoubi* v. *United States*, 25 Cl. Ct. 581, 587 (1992) ("[T]he nature of the duties assigned to [the agency employee] must be examined to determine whether [she] had the implied authority to bind the [agency.]").  More importantly, Mr. Saepoff's testimony was to the same effect.   TR at 84 ("I was authorized to do that with HDR . . . . with respect to architect/engineering contracts."); TR at 180-81 ("It was our intent to try and get to a point where a contracting officer could award a contract, but I never had that ability to do so.").[14]

Nor is there any evidence that Ms. Gonzalez ratified any contract.  *See United States* v. *Beebe*, 180 U.S. 343, 354 (1901) (ratification requires the contracting officer to have "full knowledge of all the facts upon which the unauthorized action was taken"); *see also Henke* v. *United States*, 43 Fed. Cl. 15, 27 (1999) (ratification requires "not only that there be some conduct or inaction [by the CO] constituting acquiescence, but that the acquiescence must be knowing"); *Harbert/Lummus Agrifuels Projects* v. *United States*, 142 F.3d 1429, 1433-34 (Fed. Cir. 1998) ("In the absence of either actual or constructive knowledge of the unilateral contract, the CO's silence cannot be a ratification[.]").

For these reasons, the court has determined that the Army Corps' March 11, 2004 e-mail was not an offer to award the Lynden Project to NASCENT.

> **b.**     **Even If The Army Corps of Engineers' March 11, 2004 E-Mail Was An Offer, Plaintiff's March 16, 2004 Facsimile Was Not An Acceptance.**

The court similarly rejects NASCENT's view that its March 16, 2004 facsimile was an acceptance.  *See* JX 38. The March 16, 2004 "Value Engineering *Proposal*" was self-styled as a "proposal," a classic example of an offer.  JX 38 at COE 1059 (emphasis added); *see also* 48 C.F.R. §2.101 (defining offer as "a response to a solicitation that, *if accepted*, would bind the offeror to perform the resultant contract" and adding that "responses to requests for proposals (negotiation) *are offers called 'proposals'*" (emphasis added)).

NASCENT's March 16, 2004 facsimile also states that "the savings *offered* is *contingent* on simultaneous award and complete execution of both projects."  JX 38 at COE 1059 (emphasis added).  Such language is inconsistent with acceptance of an offer, because the proposed savings were "contingent on" the "award" of both the Blaine Project and the Lynden Project.  This fact is also consistent with the Army Corps Project Manager and Technical Representative's testimony

---

[14]  Although Mr. Saepoff's testimony states a legal conclusion, his perception of his authority certainly bears on whether the ability to contract was "integral" to his job.

that during the March 11, 2004 conference call he told NASCENT that "they should maximum their profit on Schedule A," because he "wanted to make sure that they were whole on Schedule A." TR at 299 (Saepoff). Moreover, as late as April 16, 2004, NASCENT continued to refer to its March 16, 2004 facsimile as an offer, not an acceptance. *See* JX 47 (purporting to "confirm[ ] that the terms and provisions included in our original *offer*, and subsequent revisions, is hereby extended" (emphasis added)).

Even if NASCENT's March 16, 2004 facsimile had attempted to accept a previous Army Corps offer, it was, at best, a counteroffer. *See First Commerce Corp.* v. *United States*, 335 F.3d 1373, 1381 (Fed. Cir. 2003) ("'A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer.'" (quoting RESTATEMENT (SECOND) OF CONTRACTS § 59 (1979)); *see also Bogley's Estate* v. *United States*, 514 F.2d 1027, 1032 (Ct. Cl. 1975) ("The offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and the acceptance must be made absolutely and unqualifiedly."). But, NASCENT did not accept the terms of the Army Corps' March 11, 2004 e-mail.

At trial, Mr. Fashimpaur and Mr. Sheppard testified that they were told that NASCENT would be awarded the Lynden Project during conversations with the Army Corps in February and March of 2004, but neither witness provided any specific details about what was said. TR at 483-84 (Saepoff); TR at 616-18, 625-26 (Fashimpaur);[15] TR at 707-08, 721-24 (Sheppard). As a matter of law, in any event, oral representations cannot trump the written text of Mr. Saepoff's March 11, 2004 e-mail, which, even viewed in a light most favorable to NASCENT, at *most* offered a contract with an option for the Lynden Project. *See Spence* v. *United States*, 156 F. Supp. 556, 558 (Ct. Cl. 1957) (explaining that "the express language of . . . [an] offer" must be "given greater weight" than "oral testimony" that "flies into the face of these documents"). In addition, Ms. Gonzalez, Ms. Newby, and Mr. Saepoff all testified that the Army Corps never made an offer to NASCENT to build the Lynden Project. TR at 181-82, 287-88 (Saepoff); TR at 643 (Newby); TR at 800 (Gonzalez). And, this testimony is consistent with the evidence that the Army Corps did not have funds for the Lynden Project. *See, e.g.*, JX 31, 34, 35, 41, 64. Therefore, the court considers the Army Corps' March 11, 2004 e-mail to be the best reflection of the "value engineering" discussions in February and March of 2004. NASCO has not met the burden to provide probative evidence that Sheppard's and Fashimpaur's recollections of their conversations with the Army Corps reflect anything more than a misunderstanding.

For these reasons, the court has determined that NASCENT's March 16, 2004 facsimile was not an acceptance, even assuming, *arguendo*, that the Army Corps' March 11, 2004 e-mail was an offer.

---

[15] *But see supra* note 10 (discussing the inconsistencies between Mr. Fashimpaur's trial testimony and his deposition testimony on this point).

**B.    Whether The Parties Formed A Contract On April 21, 2004, In Response To Plaintiff's March 16, 2004 Facsimile Proposal Offering To Construct The Blaine Project, With An Option To Construct The Lynden Project.**

In the alternative, NASCENT argues that the March 16, 2004 facsimile proposal could be considered an offer to perform both projects that was subsequently accepted by the Army Corps by an April 22, 2004 facsimile.  Pl. Br. at 48.  The Government agrees that NASCENT's March 16, 2004 facsimile was an offer, but argues that the Army Corps accepted the offer by its April 21, 2004 communication.

**1.    The Plaintiff's Argument.**

NASCENT argues that the April 21, 2004 DD Form 1155 "Order For Supplies Of Services" was not an acceptance.  Pl. Br. at 50.  First, although the form was signed by an Army Corps CO, it was not signed by NASCENT.  Pl. Br. at 50.

Second, the DD Form 1155 was an expired 1998 version of the form that was superseded by a 2001 version.  Pl. Br. at 46, 50; *compare* PX 67 (April 21, 2004 communication containing Jan. 1998 version of DD Form 1155), *with* PX 68 (April 22, 2004 facsimile containing the updated December 2001 version of "DD Form 1155" stating "PREVIOUS EDITION IS OBSOLETE").

Third, NASCENT states that both during the "value engineering" discussions and in the March 16, 2004 facsimile,[16] it stressed that it would not contract with the Army Corps unless it was awarded both the Blaine Project and Lynden Project.  Pl. Br. at 47, 50.  Despite the fact that the RFP allowed the Army Corps to award *either* project, *or* both projects, the Army Corps "made it clear both through . . . Saepoff[ ] and . . . Gonzalez, that it wanted to award both [the] Blaine [Project] and [the] Lynden [Project] to NASCENT[.]"  Pl. Br. at 48.  Because the April 21, 2004 facsimile appears to only award the Blaine project, it does not constitute a "meeting of the minds."  Pl. Br. at 47.

**2.    The Government's Response.**

The Government responds that the April 21, 2004 DD Form 1155 evidences a contract to construct only the Blaine Project, with an option for the Lynden Project.  Gov't Br. at 50.  This form was signed by the Army Corps' Deputy Director of Contracting, an authorized CO, and accepted NASCENT's March 16, 2004 offer.  DX 54 at NASCO 001048 (signature by Sherrell).

---

[16] NASCO describes the March 16, 2004 facsimile as making "clear that [NASCENT's] willingness to perform any work for the government was expressly 'contingent upon simultaneous award and complete execution of both projects.'"  Pl. Br. at 54 (quoting the cover letter to the March 16 facsimile, PX 55).  NASCO, however, only quotes part of the relevant sentence.  The complete text reads: "Accordingly, the *savings offered* is contingent on simultaneous award and complete execution of both projects."  PX 55 (emphasis added).

25

This was the first document either party produced confirming the Army Corps' acceptance of NASCENT's March 16, 2004 offer.

The Government also addresses each of NASCENT's theories of why the April 21, 2004 DD Form 1155 does not evidence the contract. First, NASCENT wrongly attaches significance to the fact that the April 21, 2004 DD Form 1155 was not signed by a NASCENT representative. Gov't Reply at 7. The March 16, 2004 facsimlie was signed by NASCENT; thus there is a signed offer. *Id.* Furthermore, the instructions provided by the Department of Defense FAR Supplement ("DFARS") requires only that the CO sign DD Form 1155, not the contractor.[17] Gov't Reply at 7.

Second, it is immaterial that the April 21, 2004 DD Form 1155 used was an outdated version, because the common law requirements to form a government contract are "(1) mutuality of intent . . .; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson* v. *United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003). None of these factors is undermined by the use of an expired DD Form 1155. Gov't Reply at 6-7. Moreover, NASCENT does not cite any authority that holds that the Government's use of an out-of-date form voids an otherwise valid contract. *Id.* at 7.

Third, NASCENT is incorrect in asserting that its March 16, 2004 facsimile proposal offered only to build both Projects. The plain text of the "Proposal" contains a separate proposal for the Blaine Project on "Schedule A." JX 38 at COE 1060. Such an award also would be consistent with the RFP, allowing the Army Corps to award the Blaine Project and the Lynden Project to different bidders. *See* JX 13 at COE 0061-62. Furthermore, Fashimpaur testified that the Blaine proposal stood on its own (TR at 585), and NASCENT expressly stated that all "combined Blaine and Lynden award" savings were built into the pricing of the Lynden Project, not the Blaine Project. JX 38 at COE 1059.

Finally, the Government argues that if the April 21, 2004 DD Form 1155 governs, then it unambiguously awarded Blaine only, with the Lynden Project as an option. Gov't Br. at 33.[18] This Form identifies items only Schedule A, with 0001 CLINs, *i.e.*, items associated with the

---

[17] DFARS § 253.213 provides that DD Form 1155 should be filled out in accordance with DFARS Procedures, Guidance, and Information ("PGI"), § 253.213. DFARS and DFARS PGI *available at* http://www.acq.osd.mil/dpap/dars/dfarspgi/current/index.html (last visited January 11, 2012). In turn, the PGI requires the CO to sign the form. PGI § 253.213-70(e) at "Instructions for Block 24." The PGI, however, only requires the contractor to sign if a check box is marked in Block 16. *Id.* at "Instructions for Block 16." That box was not checked here. DX 54 at NASCO 001048.

[18] This is confirmed by the April 22, 2004 facsimile from the Army Corps that continued to list Lynden Project CLINs as optional (JX 51 at NASCO 001910-12), and by the May 5, 2004 Modification No. 1 imposing a limit on the time during which the Government could exercise option rights to construct the Lynden Project. Gov't Reply at 5-6.

Blaine project, as having been awarded. DX 54 at NASCO 001052. Furthermore, the total award in the April 21, 2004 DD Form 1155 was $6,466,717.00, *i.e.*, the precise amount that NASCENT bid for the Blaine project alone. DX 54 at NASCO 001048. By contrast, the Lynden Project is only mentioned in the supplemental "Alterations in Contract," Form FAR 52.252-4, attached to the DD Form 1155. DX 54 at NASCO 001048-51. On this form, the 0002 Schedule B Lynden CLINS were all identified as "Optional Items." DX 54 at NASCO 001052. Therefore, under the terms of the contract that the Army Corps argues was formed on April 21, 2004, the Lynden Project was, in fact, an "option."

       3.       **The Court's Resolution.**

       a.       **Plaintiff's March 16, 2004 Facsimile Offered To Construct The Blaine Project, With The Lynden Project As An Option.**

The parties agree that the March 16, 2004 facsimile was an offer, but dispute the terms. The court finds that NASCENT's March 16, 2004 offer allowed the Army Corps to elect either (1) to award a contract for the Blaine Project only, with an option to later award the Lynden Project, or (2) to make a combined award of the Blaine Project and the Lynden Project. The RFP required contractors to submit separate proposals for the Blaine Project on Schedule A, the Lynden Project on Schedule B, and for the combined project on Schedule C, and allowed the Army Corps to issue an award, pursuant to any of the schedules. JX 13 at COE 0061-63, 0068. NASCENT's March 16, 2004 offer was structured so as to allow the Government to award the Blaine Project only. The Army Corps' Project Manager and Technical Representative and NASCENT's Project Manager confirmed at trial that any potential savings "w[ere to be] credited to the *Lynden* Project[.]" JX 38 at COE 1059 (emphasis added); *see also* TR at 297 (Saepoff) ("I . . . advised them that if there was any savings . . . that we wanted that to be reflected in Schedule B [Lynden.]"); TR at 500 (Fashimpaur) (testifying that savings reflected on Schedule B "represent[ed] the cost savings that we were able to offer the [Army] Corps . . . based off of doing the combined projects."). The court credits both witnesses' testimony that NASCENT was instructed to complete Schedules A and B to add up to Schedule C, by incorporating any savings to Schedule B.[19] Since the RFP reserved the Army Corps' right to award the projects separately, and the March 16, 2004 facsimile does not suggest that the Blaine Project could not be awarded separately, the Army Corps was free to accept NASCENT's offer only to build the Blaine Project.

NASCENT's Project Manager testified that he heard NASCENT's Co-Manager tell the Army Corps that NASCENT was unwilling to perform only the Blaine Project. TR at 631 (Plaintiff's counsel reading Fashimpaur's deposition testimony). Aside from the fact that this

---

[19] The March 16, 2004 facsimile provided that any savings were "contingent on simultaneous award . . . of both projects." JX 38 at COE 1059. Therefore, NASCENT's offer may not have allowed the Army Corps to award only the Lynden Project, because this was contrary to the parties' negotiations and the text of NASCENT's March 16, 2004 facsimile. Nothing in the March 16, 2004 facsimile, however, suggests that the Blaine Project could not have been awarded separately, since any savings were built into the Lynden Project bid.

testimony is hearsay, even NASCENT's Co-Manager did not directly corroborate this testimony, though he understood that the "value engineering" discussions in February/March of 2004 concerned both projects.  TR at 706-711 (Sheppard).  If NASCENT had been unwilling to construct the Blaine Project alone, it would have reacted strongly, negatively, and *clearly* to the Army Corps' March 11, 2004 e-mail, in which the Lynden Project was referred to as an option.  *See* Pl. Reply at 6-7 [stating that March 11, 2004 was the first time "that any [Corps] employee used [the] moniker [option] with regard to Lynden").  NASCENT's Project Manager's testimony also is inconsistent with NASCENT's behavior.  On May 10, 2004, the CO issued a Notice to Proceed "with the work covered by Contract No. DACA67-03-D-2011 Task Order 0002."  JX 57.  If NASCENT bid only on the combined project, and if any saving were contingent on simultaneous performance of both projects, then it would have started construction of both projects simultaneously.  NASCENT's Co-Manager's explanation that construction started first on the Blaine Project only, because it was the most urgent project (TR at 725-727), conflicts with Mr. Giuliano's description of CBP's priorities (PX 133 at 114-15) and with NASCENT's belief that it needed to perform the projects simultaneously to realize its proposed economies of scale.

For these reasons, the court has determined that NASCENT's March 16, 2004 facsimile contained two offers: one to build Blaine for the price listed in Schedule A, with an option to later build Lynden for the price listed in Schedule B, and a second offer to build Blaine and Lynden simultaneously for the price listed in Schedule C.  The court also has determined that NASCENT's statements and actions at the time of the contract were inconsistent with its litigation position that it did not offer to build only the Blaine Project.

### b.      The Army Corps Of Engineers' April 21, 2004 DD Form 1155, With Attachments, Accepted Plaintiff's March 16, 2004 Offer.

The April 21, 2004 DD Form 1155 is signed by the Deputy Director of Contracting, who is an authorized CO.  DX 54 at NASCO 001048.  The total listed on the DD Form 1155 for "Order for Supplies and Services" is $6,466,717.00, the exact amount of the Schedule A CLINs for the Blaine Project.  *Compare* DX 54 at NASCO 001048, *with* JX 38 at COE 1060.  It also lists only Schedule A (Blaine Project) 0001 CLINs as "base items" and lists the Schedule B (Lynden) 0002 CLINs as "optional items."  DX 54 at NASCO 001052.  Thus, if the April 21, 2004 facsimile was a valid acceptance, then it only awarded the Blaine Project — a point which NASCO does not appear to dispute.  *See* Pl. Br. at 46-49, 50-51.

NASCO's attacks on the validity of the April 21, 2004 DD Form 1155 are unavailing.  As the Government correctly points out, NASCO cites no authority for its first proposition, *i.e.*, that a DD Form 1155 must be signed by the *contractor* in order to form a contract.  It is well established that "[u]nless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances."  RESTATEMENT (SECOND) OF CONTRACTS § 30(2) (1981).[20]  Since NASCENT's March 16, 2004

---

[20] *But cf. Lomas & Nettleton Co.* v. *United States*, 1 Cl. Ct. 641, 644 (1982) ("[W]here a statute, regulation, or contract requires a written acceptance, an oral acceptance is ineffective.").  In *Lomas*, the court held that the Government could not be bound to an oral contract,

facsimile was an "offer," the Army Corps could accept it by any reasonable and legally authorized means, and it did so by faxing a signed DD Form 1155 to NASCENT.  In addition, DD Form 1155 contains a section stating: "*If* this box is marked, supplier must sign Acceptance and return the following number of copies."  DX 54 at NASCO 001048 (Block 16) (emphasis added).  That box is unchecked on the April 21, 2004 DD Form 1155, indicating that NASCENT's signature was not required.  DX 54 at NASCO 001048.

NASCO's argument that the April 21, 2004 DD Form 1155 is invalid because it uses an expired version is similarly unpersuasive.  A comparison of the 1998 version and the 2001 version evidences no material differences.  *Compare* DX 54 at NASCO 001048, *with* DD Form 1155, *available at* http://www.dtic.mil/whs/directives/infomgt/forms/eforms/dd1155.pdf.  The only changes are minor formatting and adding space for the Government representative to provide contact information in boxes 27c-f.[21]  Moreover, NASCENT has not directed the court's attention to any caselaw, statute, or regulation suggesting that the use of an expired form invalidates an otherwise valid acceptance of a contractor's offer.  FAR § 216.505(2) states that "[o]rders placed under indefinite-delivery contracts may be issued on DD Form 1155, Order for Supplies or Services."  48 C.F.R. § 216.505(2).  The DFARS Procedures, Guidance, and Information also provides no guidance regarding the effect of using an obsolete version of DD Form 1155.  *See* PGI, § 253.213, *available at* http://www.acq.osd.mil/dpap/dars/dfarspgi /current/index.html.  Accordingly, the court declines to find that no meeting of the minds occurred simply because the Army Corps utilized an expired, but materially identical, version of DD Form 1155.  *See Penn-Ohio Steel Corp.* v. *United States*, 354 F.2d 254, 267 (Ct. Cl. 1965) (holding that when a Government official has approved a contract, but not filled out a "pro forma approval and a formal document," a contract is nonetheless formed, and that to hold otherwise "would exalt form over substance" (internal quotation marks omitted)).

For these reasons, the court has determined that the April 21, 2004 DD Form 1155 accepted NASCENT's offer to build the Blaine Project per Schedule A of its March 16, 2004 facsimile, with an option allowing the Army Corps to later order the Lynden Project to be built.

---

notwithstanding § 30 of the RESTATEMENT (SECOND) OF CONTRACTS, because the applicable regulations required the Government's acceptance to be in writing.  *Id.*  Here, the acceptance *was* in writing, and NASCO has not cited any authority suggesting that any regulation requires a *contractor* to co-sign a DD Form 1155 to render it a valid acceptance of an outstanding written offer.

[21] The new information requested in boxes 27c-f of the 2001 version of the form was provided by the Army Corps on the expired version of the form that it utilized.  DX 54 at NASCO 001048 (providing the CO's e-mail, telephone number, and printed name in Box 24).

**C.  Assuming, *Arguendo*, That A Contract Was Not Formed On April 21, 2004, Whether The Army Corps Of Engineers' April 22, 2004 Facsimile Was A Contract To Construct The Blaine Project, With The Lynden Project As An Option.**

**1.  Assuming, Arguendo, That A Contract Was Formed By The Army Corps Of Engineers' April 22, 2004 Facsimile, Did The Terms Thereof Unambiguously Award Plaintiff The Blaine Project, With The Lynden Project As An Option?**

Whether a contract provision is "ambiguous is . . . a question of law." *NVT Technologies, Inc.* v. *United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). Therefore, the United States Court of Appeals for the Federal Circuit requires that before the court can find ambiguity in a contract, both parties interpretations must "fall within a 'zone of reasonableness.'" *Id.* (quoting *Metric Constructors, Inc.* v. *NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)). The contractor's interpretation need not be, however, "the only possible reasonable interpretation, or even the best one," so long as it is reasonable. *See States Roofing Corp.* v. *Winter*, 587 F.3d 1364, 1369 (Fed. Cir. 2009). In determining whether a given interpretation is within the zone of reason, the court must examine whether it recognizes every provision of the contract. *NVT Technologies*, 370 F.3d at 1159 ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

The difficulty in interpreting the contract at issue in this case concerns two seemingly contradictory portions of the April 22, 2004 facsimile. On one hand, the DD Form 1155 at page 09/19 states an award amount of $10,905,864, *i.e.*, the amount for both the Blaine Project and the Lynden Project combined. JX 51 at NASCO 001913. On the other hand, pages 03/19 through 08/19 are identical to pages enclosed in a prior April 21, 2004 communication and identifies all of the Lynden 0002 CLINs as "OPTIONAL ITEMS." JX 51 at NASCO 001910.

The Government's interpretation of the April 22, 2004 facsimile is the only interpretation that is within the "zone of reason," because it is the only interpretation that does not render portions of the contract "inexplicable, void, or superfluous." *NVT Technologies*, 370 F.3d at 1159. The award amount on page 09/19 is consistent with the Lynden Project being an option, because it identifies the amount that would be awarded if that option were exercised.[22] This interpretation is also consistent with the fact that on page 06/19 the Army Corps added up the "Base Items" (Blaine 0001 CLINs) and the "Optional Items" (Lynden 0002 CLINs) to reach a

---

[22] The Government suggests that the $10,905,864 amount and Ms. Sherrell's name were typed onto the contract by NASCENT, rather than the Army Corps, in light of the font used on page 09/19 and the fact that other certain information that the Army Corps placed on the April 21, 2004 form was not entered onto the April 22, 2004 form. TR at 700-703 (colloquy between counsel and the court). The court attributes no improper conduct to NASCENT, particularly since the Government failed to produce any copy of the April 22, 2004 facsimile from its own files.

"Grand Total" of $10,905,864 — the same number that appears in the "unit price" and "amount" blocks on the DD Form 1155.  JX 51 at NASCO 001910, 001913.

NASCO, by contrast, has not provided any alternative explanation for why the court should disregard the term "optional items" on page 06/19.  Instead, NASCO simply asserts that "[r]egardless of the *nomenclature*, the [Army Corps] awarded Lynden to NASCENT" and "[w]hether it was called an 'option' or not, the government agreed to, and did award, Lynden to NASCENT."  Pl. Reply at 6, 8.  Simply arguing that text of a contract — particularly text that has an established legal meaning — is mere "nomenclature" defies the rules of contract construction applied by the United States Court of Appeals for the Federal Circuit.  NASCO's construction would have the court read the term "optional items" out of the contract or construe it in a manner that is not reasonable as a matter of law and/or as a matter of fact based upon the record in this case.

For these reasons, the court has determined that even if the contract between the parties was formed on April 22, 2004, instead of April 21, 2004, the contract unambiguously awarded NASCENT only the Blaine Project with the Lynden Project as an option.

> **2.      Assuming, *Arguendo*, That The Army Corps of Engineers' April 22, 2004 Facsimile Was Ambiguous, Was Any Ambiguity "Patent," Thus Requiring The Ambiguity To Be Construed In Favor Of The Army Corps Of Engineers?**

Assuming *arguendo* that the April 22, 2004 DD Form 1155 facsimile was ambiguous, the court still could not adopt NASCO's construction, because any ambiguity in the contract would be "patent."  *See Grumman Data Sys. Corp.* v. *Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996) ("Once we conclude that the contract language about which the protestor complains is ambiguous, we must then determine whether that ambiguity was patent so as to impose a duty to seek clarification, or only latent." (internal citations and quotation marks omitted)).

The United States Court of Appeals for the Federal Circuit has held that "[a] 'patent ambiguity'" is one that is "'obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start.'"  *States Roofing Corp.*, 587 F.3d at 1372 (quoting *H & M Moving, Inc.* v. *United States*, 499 F.2d 660, 671 (Ct. Cl. 1974)).  For example, a patent ambiguity arises where "the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring[.]"  *Stratos Mobile Networks USA, LLC* v. *United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000).  Therefore, where a contract is patently ambiguous, the court must construe the contract in favor of the Government.  *See NVT Technologies*, 370 F.3d at 1162 ("If an ambiguity is obvious and a bidder fails to inquire with regard to the provision, his interpretation will fail.").

In *NVT Technologies*, the ambiguity at issue involved the manner in which the Government listed twelve line items in a solicitation for services requiring a separate bid on hundreds of line items.  *Id.* at 1158.  Each line item indicated the "frequency" with which the task needed to be performed during the course of the year (*e.g.*, daily, weekly, monthly).  *Id.*

The twelve line items at issue differed from all of the other line items in the solicitation, as they listed the "frequency" as a number, instead of as a descriptor. *Id.* at 1157. The protesting contractor prepared its bid on the assumption that the "frequency" number for those twelve line items operated as if it indicated the number of times over the course of the year that the task was to be performed, which was not the Government's intent. *Id.* As a result, the bid substantially overestimated what it actually cost the contractor to perform the tasks that the Government intended to solicit.[23] *Id.* at 1162. The United States Court of Appeals for the Federal Circuit explained: "Where, as here, a certain set of line items is expressed in a manner so different from hundreds of other line items, yielding totals disproportionate to the remainder of the solicitation, we find the differences to be 'obvious, gross, [or] glaring,' requiring NVT to inquire." *Id.* at 1162 (quoting *H & M Moving*, 499 F.2d at 671) (alterations in original).

Therefore, a contractor is responsible for reviewing every line item in a government contract. If the contractor ignores inconsistencies in line items, it does so at its own peril, at least when the line items in question have a "disproportionate" impact on the overall size of the contract. *Id.* at 1162. In this case, page 06/19 of the April 22, 2004 facsimile contained only eight line items—four Schedule A 0001 CLINs and four Schedule B 0002 CLINs. JX 51 at NASCO 001910. The four 0001 CLINs are listed as "base items," whereas the four 0002 CLINs are listed as "optional items." JX 51 at NASCO 001910. This is an "obvious, gross, [or] glaring," difference in the line items and had a disproportionate effect upon the size and nature of the contract. *See NVT Technologies*, 370 F.3d at 1162. Therefore, NASCENT was on notice to seek clarification. Its failure to do so defeats its interpretation of the contract. The April 22, 2004 DD Form 1155 facsimile awarded a contract to NASCENT to construct only the Blaine Project.

For these reasons, the court has determined that, even if a contract was formed on April 22, 2004, and even if that contract was ambiguous, the ambiguity was patent. Accordingly, the court has determined that such a contract would have only awarded the Blaine Project to NASCENT, with an option to build the Lynden Project.

### D.    Whether The Army Corps Of Engineers Breached The Implied Covenant of Good Faith And Fair Dealing.

#### 1.    The Plaintiff's Argument.

Finally, NASCENT argues that the Army Corps breached the implied covenant of good faith and fair dealing by refusing to permit NASCENT to perform the Lynden Project, to its financial detriment. Pl. Br. 55-56. Breaches of the implied covenant of good faith and fair dealing "typically involve some variation on the old bait-and-switch" in which "[f]irst, the government enters into a contract that awards a significant benefit" and then "the government eliminates or rescinds" the benefit. *Precision Pine & Timber, Inc.* v. *United States*, 596 F.3d 817, 829 (Fed. Cir. 2010). The Army Corps induced NASCENT to provide pricing for both the

---

[23] The twelve miscalculated line items constituted $6 million out of a total $43 million dollar bid. *Id.* at 1162.

Blaine Project and the Lynden Project on the assumption NASCENT would be awarded both projects. Pl. Br. at 56.

NASCENT insists that the Army Corps knew that it would not attract contractors' interest, unless it offered both projects. Pl. Reply at 22 (citing PX 8 at COE 015811 (the Army Corps' Project Management Plan)).[24]  Moreover, CBP was in a hurry to have the Blaine Project completed, because of its importance to DHS/CBP. TR at 71-72 (Saepoff). In light of a "fair amount of pressure from the [CBP]," the Army Corps' Project Manager and Technical Representative represented to NASCENT that both projects would be awarded in order to get the Blaine Project completed. Pl. Reply at 23. In addition, the Army Corps' failure to secure funds for the Lynden Project demonstrated bad faith. TR at 128-36 (Saepoff testifying regarding reprogramming). *But see supra*, Section I.M. (detailing Saepoff's efforts to obtain funds). Therefore, the Government engaged in a "bait-and-switch" by falsely inducing NASCENT into building the Blaine Project immediately and at a discount. Pl. Reply at 23-24.

## 2.    The Government's Response.

The Government responds that the evidence does not show that the Army Corps acted in bad faith. Gov't Br. at 53. The Government finds three errors in NASCENT's assertion that the Army Corps pulled a "bait and switch." Gov't Reply at 13-15. First, every Army Corps employee who testified indicated that no one from the Army Corps ever offered NASCENT both projects. Gov't Reply at 14. Second, the evidence shows that the Army Corps did not seek a reduction in price for Blaine, but rather instructed NASCENT to price all savings into Lynden. TR at 168-69, 296-99 (Saepoff). Third, NASCENT followed the Army Corps' instructions and did not price savings from the combined stations into its Schedule A bid for Blaine. JX 38 at COE 1059 (March 16, 2004 facsimile, signed by Mr. Fashimpaur, stating that "the amount of savings offered by NASCENT. . . was credited to the Lynden Project"). Indeed, the March 16, 2004 Schedule A proposal for Blaine represented a net *increase* of $39,663 from NASCENT's January 28, 2004 bid. *Compare* JX 38 at COE 1060 (March 16, 2004 bid for $6,466,717), *with* JX 29 at COE 1078 (January 28, 2004 bid for $6,427,054). Thus, NASCENT's "bait-and-switch" argument fails to demonstrate any bad faith by the Government.

---

[24] A section of the Army Corps' Project Management Plan entitled "risks associated with this acquisition strategy," states that "[i]f these projects are solicited separately, market forces may limit contractor interest due to the cost of preparing the RFP proposal for construction projects valued at less than $5,000,000." PX 8 at COE 015811. Yet NASCO's theory is that the Army Corps bundled the Lynden Project, which was valued at less than $5,000,000, with the Blaine Project, valued at *more* than $5,000,000, to induce contractors to submit bids for the Blaine Project, the more expensive of the two. This reasoning is inconsistent with the Army Corps' stated concerns about finding contractors for projects valued at less than $5,000,000. In any event, the statement that contractor interest might be limited is materially different from NASCENT's claim that the Army Corps "knew . . . it was unlikely that *any* contractor would take the time and suffer the expense of submitting a proposal." Pl. Reply at 22 (emphasis added).

### 3.    The Court's Resolution.

The duty of good faith and fair dealing is "inherent in every contract." *Precision Pine*, 596 F.3d at 828 (citing RESTATEMENT (SECOND) OF CONTRACTS (1979) § 205).  Demonstrating bad faith, however, requires the plaintiff to present "almost irrefragable proof" that the Government acted with "specific intent to injure the plaintiff."  *Galen Med. Assoc., Inc.* v. *United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (internal quotation marks omitted); *see also Spezzaferro* v. *FAA*, 807 F.2d 169, 173 (Fed. Cir. 1986) ("Government officials are presumed to carry out their duties in good faith.").  NASCENT's argument that the Army Corps violated the implied duty of good faith and fair dealing relies upon two premises: (1) the Army Corps initially awarded the Lynden Project to NASCENT to induce NASCENT to build the Blaine Project; and (2) the Army Corps realized savings as a result of inducing NASCENT to bid for both projects, but by only issuing a notice to proceed on the Blaine Project.

As the court previously determined, the Army Corps awarded NASCENT a contract only to construct the Blaine Project.  To the extent that the terms of the April 22, 2004 DD Form 1155 facsimile were ambiguous or confusing, the evidence shows that no contract ever materialized awarding NASCENT the Lynden Project.  The evidence also demonstrates that NASCENT was not, in fact, induced to offer the Blaine Project at a loss.  The court finds the Army Corps' Project Manager and Technical Representative's testimony at trial credible, *i.e.*, he instructed NASCENT to be sure that it would be made "whole" if it were to only be asked to construct the Blaine Project per Schedule A.  TR at 299 (Saepoff).  This testimony also was consistent with the pricing structure that NASCENT submitted by its March 16, 2004 facsimile and with the repeated references to the Lynden Project, *by both parties*, as an "option."  JX 36 at COE 032044, JX 38 at COE 1059, DX 54 at NASCO 001052, JX 51 at NASCO 001910, 001914.  Of course, the Army Corps' communications with NASCENT may have contributed to some confusion.  But, NASCENT should have sought to clarify any confusion that may have arisen, rather than perpetuating it.  JX 38 at COE 1059 (March 16, 2004 proposal), JX 51 at NASCO 001914 (Sheppard's April 16 letter); *see also* TR at 721 (Sheppard) (explaining that NASCENT called Lynden an option because "that's what [Saepoff] called it").  The court categorically rejects any suggestion that the Army Corps acted in bad faith, in light of the use of the word "option" by both parties.

For these reasons, the court has determined that the Army Corps did not breach the implied covenant of good faith and fair dealing.

**VI.     CONCLUSION.**

For the reasons stated above, the Clerk of Court for the United States Court of Federal Claims is directed to enter judgment for the Government on all claims.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

**COURT EXHIBIT A**

**Plaintiff's Witnesses**
(In order of appearance)

   **Mr. Steven Saepoff** was the Army Corps of Engineers' Project Manager and Technical Representative for the Lynden Project and the Blaine Project from its inception until May 2004. TR at 60, 227.  He is a graduate of the United States Coast Guard Academy with a B.S. in Marine Science and received a Masters Degree from Catholic University of America in Environmental Engineering and Management.  He worked in the Seattle District Office from December 1999 until December 2008.  Mr. Saepoff was heavily involved in assessing bids for the Blaine Project and the Lynden Project and communicating with bidders.  *See, e.g.*, TR at 110, 115, 120-21, 161-62.  Mr. Saepoff, however, was not the CO.  TR at 75-349; *see also* TR 421-39.

   **Mr. Kurt Fashimpaur** was NASCENT's Project Manager/Estimator for the Blaine Project and the Lynden Project.  TR at 440.  He began working for NASCENT around March of 2004 and continued his affiliation through the Blaine project into 2007.  TR at 440.  From 2002 through 2004, he worked as an estimator for Shaw-Beneco, the larger of the two members of the NASCENT joint venture.  TR at 441.  He currently works as an Estimator Project Manager for Entelen Design Build in Salt Lake City, Utah.  Mr. Fashimpaur prepared NASCENT's bid for the Blaine Project and the Lynden Project and also oversaw design work on the project.  TR at 442-43.  His testimony consumed approximately half of the second day of trial.  TR at 439-632.  The court found Mr. Fashimpaur generally be credible, but has determined that his testimony regarding NASCENT's understanding of the contract negotiations during the critical period of February – April 2004 was not reliable.

   **Ms. Susan Newby** was and is an Army Corps Contract Specialist in the Seattle District of the Army Corps of Engineers and served in that capacity for the Blaine and Lynden Projects. TR at 633-34.  She was supervised by Susan Sherrell and Sharon Gonzalez.  TR at 635-36.  As Contract Specialist, Ms. Newby developed the solicitation and prepared the award for the Blaine Project and the Lynden Project.  TR at 643-69.

   **Mr. Dennis ("Rusty") Sheppard** was and is the Co-Owner and Chairman of Native American Services and the Co-Manager of the NASCENT joint-venture.  TR at 672.  He co-founded Native American Services in 1998, with Mr. Matt James, who is a Native American. TR at 672.  In the summer of 2003, Mr. Sheppard arranged for NASCO to enter into the NASCENT joint-venture with Shaw-Beneco.  TR at 673.  At the time of trial, NASCO was managing a backlog of $400-500 million in federal contracts, but the award of the Blaine Project and/or the Lynden Project was the largest in NASCO's history at that time.  TR at 672, 674.  Mr. Sheppard was not directly involved in the technical submission of NASCENT's proposal for the Blaine Project and the Lynden Project, but was present for some of the negotiations between NASCENT and the Army Corps during February and March of 2004.  TR at 675-79, 706-77.

**Ms. Sharon Gonzalez** was one of two Army Corps Contracting Officers involved with the Blaine Project and the Lynden Project. TR at 749-51, 758-59. She reported to Ms. Susan Sherrell, the Deputy Director of Contracting for the Seattle District. TR at 751. She began her employment as a Contract Specialist in 1999 and is now retired. TR at 749. She had at least one phone call and one in-person meeting with NASCENT and Army Corps personnel during February and March of 2004. TR at 753, 763-64.

**Mr. Joseph Giuliano** worked in a variety of positions for the Washington Border Patrol Sector and was Army Corps' client on the Blaine Project and the Lynden Project. His videotaped April 21, 2011 deposition was admitted into evidence at trial as PX 131 and the transcript of his deposition was admitted as PX 133, by the Government's Unopposed Motion on June 6, 2011. Mr. Giuliano joined the United States Border Patrol (now CBP) in 1985 and worked there until October 2008. PX 133 at 8. By spring of 2004, he was serving as Deputy Chief for the Washington Border Patrol Sector. He regularly discussed the Blaine Project and the Lynden Projects with Mr. Saepoff both before and after award of the Blaine Project to NASCO. PX 133 at 34, 43.

**COURT EXHIBIT B**

**The Government's Witnesses**
(In order of appearance)


    **Ms. Susan Sherrell** was Deputy Director of Contracting for the Army Corps of Engineers at the time of the Blaine Project and the Lynden Project, a position that she held from 1997 to 2005. TR 842. She also was a Contracting Officer. TR 842-56. She is currently the Director of Western Acquisitions for the National Oceanic and Atmospheric Administration. TR 842. Her electronic written signature appears on the April 21, 2004 DD Form 1155 and her named is typed into the signature block on the DD Form 1155 that is included in the April 22, 2004 facsimile. TR 844-45. Ms. Sherrell was Gonzalez's supervisor. TR 848.


    **Mr. Kevin Williams** was the Government's expert witness on accounting and damages issues. He is the author of a February 18, 2011 Defense Contract Audit Agency ("DCAA") Report that was issued following NASCO's August 1, 2007 Request For Equitable Adjustment. Mr. Williams is a graduate of Seattle University with a B.A. in Accounting and has served as a DCAA auditor for at least 25 years. DX 104 at 23. His February 18, 2011 Comprehensive Report was admitted as DX 104 in lieu of direct testimony. He was cross-examined briefly on the third day of the trial. TR at 856-913. Although the court did not need to reach Mr. Williams' analysis, the court would be remiss if it did not acknowledge his thoughtful preparation, expertise, and straightforward analysis of the claim at issue. In short, the court was impressed with Mr. Williams' very professional assessment. The Government is fortunate to have his services, of which the court was a beneficiary.